SVK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stewart Edward Younan, | No. CV 07-1435-PHX-SRB (LOA) |
| Plaintiff, | **ORDER** |
| vs. | |
| Vern L. Alley, et al. | |
| Defendants. | |

Plaintiff Stewart Edward Younan filed this civil rights action under 42 U.S.C. § 1983. (Doc. #4.) The parties cross-move for summary judgment, with Saldate filing his own motion and Alley and Baca filing jointly.[1] (Doc. #31, 46, 48.) The motions are ready for ruling.[2] (Doc. ## 61, 75.) Plaintiff also moves for a restraining order and Defendants respond. (Doc. ##82, 86.)

The Court will deny Plaintiff's summary judgment motion; grant Defendants' motions; and dismiss the action. The Court will deny the motion for preliminary relief as moot.

---

[1]The Court issued a Notice pursuant to Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998) (*en banc*), informing Plaintiff of his obligation to respond. (Doc. #50.)

[2]Although Plaintiff filed a response to Saldate's motion (Doc. #61), he filed no response to the summary judgment motion filed by Alley and Baca.

## I. Background

This case arises out of an investigation involving an alleged criminal syndicate; the seizure of evidence, including Plaintiff's property; an alleged plot of attempted homicide orchestrated by Plaintiff while in custody; and Plaintiff's subsequent placement in maximum security. The remaining claims and Defendants are Count II against Detective Alley, Department of Public Safety (DPS); Counts III and IV against Detective Saldate, Phoenix Police Department (PPD); and Count VI against Deputy Warden Baca, Arizona Department of Corrections (ADC) to the extent the claim relates to Plaintiff's placement in maximum custody. (Doc. #58.)  In Count II, Plaintiff alleged a claim against Alley for seizure of personal property through a fictitious warrant and keeping the property after the criminal case was over. In Counts III and IV, he alleged denial of counsel and threat to safety by Saldate regarding an interview of Plaintiff concerning additional criminal activity. And in Count VI, Plaintiff alleged due process violations against Baca regarding Plaintiff's placement in maximum custody.

Plaintiff moves for summary judgment against Alley on the grounds that his property was seized and not returned. Alley opposes and cross-moves for summary judgment on the grounds that (1) items were seized pursuant to search warrants issued by a Maricopa County judge; (2) Plaintiff challenged the warrants but withdrew the challenges; (3) the property is not gone; a Mercedes was released to a finance company and the rest is in DPS Property and Evidence as evidence in an ongoing investigation of Plaintiff's criminal syndicate; (4) Alley is no longer assigned to the investigation and has no authority regarding disposition of the seized property; (5) Plaintiff's claim is barred by <u>Heck v. Humphrey</u>, 512 U.S. 477, 486-87 (1994); and (6) Plaintiff had an adequate post-deprivation remedy to challenge the search warrants.

As to Saldate, Plaintiff moves for summary judgment on the ground that (1) Saldate interviewed Plaintiff at ADC and is responsible for Plaintiff's custody status; (2) Saldate said he was putting the word out that Plaintiff was a rat or snitch working with the police; and (3) prison staff were told that Plaintiff tried to harm a law enforcement officer from

1 prison. Saldate opposes and cross-moves on the grounds that (1) his interview of Plaintiff
2 did not violate Plaintiff's right to counsel; (2) Plaintiff's conclusory claims of threats and
3 harassment do not state a claim; (3) Saldate did not cause Plaintiff to be placed in maximum
4 security because Saldate has no authority over Plaintiff's housing status; and (4) Saldate is
5 entitled to qualified immunity.

6 Plaintiff moves for summary judgment against Baca on the ground that it was a
7 violation of Plaintiff's rights to place him in isolation without any disciplinary charges or a
8 hearing. Baca opposes and cross-moves on the grounds that (1) Plaintiff was not entitled to
9 any due process for his two-month placement in investigative detention; (2) Plaintiff received
10 due process protections for his placement in maximum security custody; and (3) Baca was
11 not involved in the classification process.

12 **II.    Summary Judgment**

13 A court must grant summary judgment if the pleadings and supporting documents,
14 viewed in the light most favorable to the non-moving party, "show that there is no genuine
15 issue as to any material fact and that the movant is entitled to judgment as a matter of law."
16 Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under
17 summary judgment practice, the moving party bears the initial responsibility of presenting
18 the basis for its motion and identifying those portions of the record, together with affidavits,
19 which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477
20 U.S. at 323.

21 If the moving party meets its initial responsibility, the burden then shifts to the
22 opposing party who must demonstrate the existence of a factual dispute and that the fact in
23 contention is material, i.e., a fact that might affect the outcome of the suit under the
24 governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the
25 dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for
26 the non-moving party. Id. at 250; see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216,
27 1221 (9th Cir. 1995). Rule 56(e) compels the non-moving party to "set out specific facts
28 showing a genuine issue for trial" and not to "rely merely on allegations or denials in its own

1  pleading." Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
2  475 U.S. 574, 586-87 (1986). The opposing party need not establish a material issue of fact
3  conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require
4  a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank
5  of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). However, Rule 56(c) mandates
6  the entry of summary judgment against a party who, after adequate time for discovery, fails
7  to make a showing sufficient to establish the existence of an element essential to that party's
8  case and on which the party will bear the burden of proof at trial. Celotex, 477 U.S. at 322-
9  23.

10  When considering a summary judgment motion, the court examines the pleadings,
11  depositions, answers to interrogatories, and admissions on file, together with the affidavits,
12  if any. Fed. R. Civ. P. 56(c). At summary judgment, the judge's function is not to weigh the
13  evidence and determine the truth but to determine whether there is a genuine issue for trial.
14  Anderson, 477 U.S. at 249. The evidence of the non-movant is "to be believed, and all
15  justifiable inferences are to be drawn in his favor." Id. at 255. But, if the evidence of the
16  non-moving party is merely colorable or is not significantly probative, summary judgment
17  may be granted. Id. at 249-50.

**Cross-Motions for Summary Judgment**

### III. Count II—Alley

As stated, Plaintiff alleges that Alley seized property pursuant to a fictious warrant and has not returned the property.

#### A. Legal Standard

The Fourth Amendment protects people against unreasonable searches and seizures and provides that no warrants will be issued without probable cause describing the place to be searched and the persons or things to be seized. U.S. Const. amend. IV. Searches and seizures inside a home without a warrant are presumptively unreasonable. Payton v. New York, 445 U.S. 573, 586 (1980).

- 4 -

**B.     Plaintiff's Motion**

In support of his motion, Plaintiff submits various search warrant documents (Doc. #31, Ex.1.) Plaintiff asserts that Alley seized property worth in excess of $500,000.00 and that it has not been returned to Plaintiff or his family. Plaintiff argues that there are no pending charges to justify Alley's continued refusal to return or reimburse Plaintiff for the property.

**C.     Alley's Response and Cross-Motion**

In support of his opposition and cross-motion, Alley submits a Statement of Facts (Doc. #49, DSOF), his declaration (id., Ex. A, Alley Decl.); the declarations of Kristine Johnson (id., Ex. B, Johnson Decl.) and Donna Contreras (id., Ex. C, Contreras Decl.); and various documents relating to the search and seizure of property.

In 2003, DPS began an investigation into a suspected criminal syndicate involving theft, armed robbery, drug dealing, and money laundering; Plaintiff was identified as the "patriarch." (DSOF ¶ 1.) Alley became lead detective in January 2005, and in May, a surveillance squad followed Plaintiff and stopped him for speeding; Plaintiff was arrested. (DSOF ¶ 2.)

The next day, Alley prepared an Affidavit in Support of Search Warrant detailing Plaintiff's and his parents' suspected criminal activities and applied for two search warrants for Plaintiff's parents' houses; the warrants were signed by Maricopa County Judge Keppel. (DSOF ¶ 3.) The warrants were executed, and, the next day, Alley returned the warrants detailing the items seized as evidence; Judge Keppel signed those returns. (DSOF ¶¶ 4, 6.)

On August 1, 2005, Plaintiff challenged the search warrants pursuant to A.R.S. § 13-3922 but later withdrew his motion and pled guilty to misconduct involving weapons with one prior felony. (DSOF ¶¶ 7, 8.) In May 2006, the state court sentenced Plaintiff to six years of imprisonment for the misconduct involving weapons and revoked his probation on a previous misconduct involving weapons and sentenced him to 2.5 years of imprisonment for that felony. (Id.) Plaintiff's criminal convictions for misconduct involving weapons were

1   the result of a gun box found in the search.  (DSOF at 11, ¶ 9.)

2         In July 2006, Alley uncovered a plot of attempted homicide on him by Plaintiff's
3   syndicate.  (Alley Decl. ¶ 9.)  Alley was taken off the case as lead detective; the case was
4   reassigned and is on-going.  (Id.)  Kristine Johnson of DPS is now lead detective and Plaintiff
5   is a main suspect.  (Johnson Decl. ¶¶ 1-2.)  Contreras, the DPS Central Property and
6   Evidence Supervisor, attests that a 2003 Silver Mercedes Benz, which was seized as evidence
7   against Plaintiff, was turned over to Camping Company.  (Contreras Decl. ¶¶ 1, 3.)  The
8   remaining evidence seized pursuant to the warrants is in DPS property in furtherance of the
9   on-going investigation.  (Johnson Decl. ¶ 2.)

10  **D.     Analysis**

11        Plaintiff's motion for summary judgment is denied because Plaintiff fails to
12  demonstrate that there is no genuine issue of material fact as to his claims of unlawful seizure
13  and retention of property.  Plaintiff's own evidence shows that property was seized pursuant
14  to search warrants, and he offers no evidence to establish that he is entitled to its return or
15  that the property has not been returned because of unlawful acts or omissions by Alley.  To
16  prevail on a claim under § 1983,  a plaintiff must allege that he suffered a specific injury as
17  a result of specific conduct of a defendant and show an affirmative link between the injury
18  and the conduct of that defendant.  Rizzo v. Goode, 423 U.S. 362, 371-72, 377 (1976).

19        Alley's motion for summary judgment is granted; Plaintiff fails to respond to Alley's
20  motion, and, thus, Alley's assertions are not in dispute.  Alley provides evidence
21  demonstrating that property was seized pursuant to search warrants; the property seized was
22  turned over to DPS Property and Evidence; it is being retained due to an on-going
23  investigation into an alleged criminal syndicate; and Alley is no longer assigned to that case
24  and has no authority over the disposition of the property seized.

25  **IV.     Counts III and IV—Saldate**

26        Plaintiff alleged that Saldate denied him counsel, had him placed in maximum-
27  security custody, and threatened his safety.

28  ///

### A. Legal Standards

A prisoner has no constitutional right to enjoy a particular security classification. Meachum v. Fano, 427 U.S. 215, 224-25 (1976) (no liberty interest protected by the Due Process Clause is implicated in a prison's reclassification and transfer decisions). See also, Hewitt v. Helms, 459 U.S. 460, 466 (1983), overruled on other grounds by Sandin v. Conner, 515 U.S. 472, 482-83 (1995); Lucero v. Russell, 741 F.2d 1129 (9th Cir. 1984). "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." Montanye v. Haymes, 427 U.S. 236, 242 (1976). But some placements in maximum security custody may implicate liberty interests requiring due process protections. See Wilkinson v. Austin, 545 U.S. 209 (2005).

A supported allegation that a correctional official made statements intending to incite inmates to attack another inmate may state a claim under the Eighth Amendment. For example, calling an inmate a "snitch" in front of other inmates with a wanton disregard for the inmate's safety may constitute a claim under the Eighth Amendment. See, e.g., Northington v. Jackson, 973 F.2d 1518, 1525 (10th Cir. 1992) (allegation that officer intended to harm inmate by inciting inmates to beat him may constitute an excessive force claim; if inmate is able to prove such intent, "it is as if the guard himself inflicted the beating as punishment"); Valandingham v. Bojorquez, 866 F.2d 1135, 1139 (9th Cir. 1989) (defendant officers calling plaintiff a "snitch" in presence of other inmates is material to § 1983 claim for denial of right not to be subjected to physical harm); Watson v. McGinnis, 964 F. Supp. 127, 131-32 (S.D.N.Y. 1997) ("a guard's intentionally calling a prisoner a snitch in order to cause him harm by other inmates states an Eighth Amendment excessive force claim") (citing cases).

### B. Plaintiff's Motion

In support of his motion, Plaintiff submits an excerpt from Saldates' interview of Plaintiff (Doc. #31, Ex. 3) and a document regarding the restriction of Plaintiff's telephone

1  calls (id., Ex. 4). In his motion, Plaintiff asserts that Saldate is responsible for Plaintiff's
2  custody status and lockdown into isolation, that Saldate interviewed him after Plaintiff's first
3  20 days of "Guantanamo Bay type level 5 isolation with no mail, no telephones, legal calls
4  to his lawyer or visits of any kind." (Doc. #31 at 3.) Plaintiff also asserts that Saldate made
5  it very clear that he was responsible for Plaintiff's complete isolation as is shown in the
6  record of the interview. (Id.)

Plaintiff also asserts that he is held in maximum security with Arizona's most violent criminals after Saldate said that he would put the word out that Plaintiff was a rat or snitch working with the police. (Doc. #31 at 3.) In addition, Plaintiff asserts that "prison staff were told that Plaintiff had tried to harm a law enforcement officer from inside prison. And thereby given the status of extraordinary isolation. . . ." (Id.) Plaintiff argues that Saldate knew or should have known that enlisting the aid of prison authorities to hold Plaintiff in isolation with no charges violated Plaintiff's rights and would create an atmosphere of harassment and retaliation. (Id. at 4.)

### C. Saldate's Motion

In support of his response and cross-motion, Saldate submits his Statement of Facts (Doc. #47, SSOF); an excerpt from Plaintiff's deposition (id., Ex. A, Pl. Dep. (June 2, 2008)); his affidavit and the transcript of the Aug. 2006 interview (id., Ex. B, Saldate Aff.; Ex. 1, Trans. Int.); and the declaration of Kristine Harkins (id., Ex. C, Harkins Decl.).

Saldate attests that he was assigned to investigate two murder plots allegedly orchestrated by Plaintiff. (Saldate Aff. ¶ 1.) The plots involved murder of a DPS detective and an informant cooperating with authorities who was providing information about a criminal syndicate that Plaintiff was leading. (SSOF ¶ 3.) In connection with the investigation, on August 15, 2006, Saldate interviewed Plaintiff in an ADC facility where Plaintiff was being held. (Id. ¶ 5.) Also present at the interview were Detective Michael Maya, a DPS Sergeant, and ADC Correctional Officer (C.O.) Thomas Lowe. (Saldate Aff. ¶¶ 4-5.) At the time of the interview, Plaintiff was unaware that the interview was being digitally recorded. (SSOF ¶ 6.)

- 8 -

1   During the interview, C.O. Lowe learned of Plaintiff's efforts to organize murder plots
2   while he was incarcerated. (Id. ¶ 9.) Based on what he learned, Lowe requested that Plaintiff
3   be transferred to a higher-security section of the prison. (Id. ¶ 10.) Lowe's request states:

> On the above date and approximate time I escorted the following Detectives from the Phoenix Police Department's Counter Terrorism/Homeland Defense Bureau into the CDU conference Room to interview inmate Younan #173538. {Detective Michael Maya; Detective Armando Saldate; Sgt. Carlos Contreras (DPS)}. During the course of this interview I learned that inmate Younan was considered a suspect as a leading conspirator in a plot to assassinate a DPS Detective; that he knew that the officer's home address and made at least one trip to do surveillance of the officer's residence. It was also evident that inmate Younan was known to have made efforts to learn the home address of the County Prosecutor in his case. Further questions by the Detectives and responses by inmate Younan indicate that he is of Assyrian ethnicity and that his extended family ("aunts & uncles") in the Phoenix area were wealthy, owning liquor stores & restaurants; thereby giving him the financial means of paying others to carry out criminal acts on his behalf. The Detectives expressed to inmate Younan that two of his alleged co-conspirators were already in custody in Maricopa County Jail under $500,000 bond each; and that Younan would soon be indicted as well.
>
> In my opinion, the above information demonstrates that inmate Younan has the means, motivation, and mindset to orchestrate the killing of a Law Enforcement Officer, - making him a greater risk to the secure and orderly operation of the prison environment. Therefore, I believe that inmate Younan's classification level should be elevated, and he should be housed in a more secure facility.

16   (Id. ¶ 11.)

17   ADC staff began an investigation into Plaintiff's classification status. (Id. ¶ 12.)
18   Plaintiff was determined to be a security threat to the prison and public and was placed in a
19   maximum security unit of the prison. (Id. ¶ 13.) Saldate attests that he has no authority over
20   the manner in which Plaintiff is housed in ADC. (Id. ¶ 14.) Harkins, ADC Classification
21   Manager, attests that Saldate has no input into Plaintiff's custody status other than Saldate's
22   confirmation that Plaintiff continues to be the subject of an on-going investigation. (Harkins
23   Decl. ¶ 32.)

24   Saldate asserts that it was an ADC employee, not Saldate, who stated that he could
25   set up a telephone call with Plaintiff's lawyer. (SSOF ¶ 10; see Ex. B, Ex.1, Trans of Int. at
26   2) Saldate argues that even if there was a violation of a right to counsel, a § 1983 claim
27   cannot be predicated on the right to counsel. See Chavez v. Martinez, 538 U.S. 760, 769
28   (2003). He asserts that threats to harass Plaintiff or his family, even if true, do not violate

- 9 -

the Constitution. He also argues that he did not cause Plaintiff to be placed in a maximum security unit; rather, it was Lowe who deemed Plaintiff a security threat. Saldate asserts that he was not involved in the prison classification process. (Saldate Aff. ¶ 8.)

### D. Plaintiff's Reply and Response to Saldate

Plaintiff asserts that Baca told Plaintiff that Baca placed him in isolation to cooperate with detectives in an investigation and that Baca had received a telephone call from Saldate saying that he did not want Plaintiff to have any telephone or other contact. (Doc. #61 at 2.) Lowe started the reclassification process after Saldate's interrogation. (Id.) Plaintiff asserts that his September 2006 hearing did not adjudicate or address the merits of Saldate's allegations. (Id.) Plaintiff argues that ADC policy does not allow for arbitrary lockdowns for investigations or for classification overrides on the basis of investigative allegations. (Id.) Plaintiff asserts that he asked Saldate about calling his lawyer and Saldate said that he would take care of it but Plaintiff was cut off from his counsel from late July 2006 to November 2006. (Id. at 3.) Counsel withdrew from Plaintiff's post-conviction petition. Plaintiff also asserts that at some point, ADC staff noted that the investigation was an old rumor and Plaintiff was reclassified to level 2 but then promptly sent to SMU-I, using "Administrative Segregation for Protection" as the reason. (Id. at 3-4.) Plaintiff argues that because of this status, the rumor that he is a snitch is in general population, which achieves what Saldate said that he would do. (Id. at 4.)

### E. Saldate's Reply

Saldate notes that Plaintiff now appears to argue not that Saldate denied him his attorney during the interview but that ADC's classification and housing in a maximum security unit caused Plaintiff to be unable to speak with his lawyer. (Doc. #75 at 3.) Saldate argues that Plaintiff has not shown him to be liable either under a theory of supervisory liability or conspiracy. (Id. at 4.) He argues that the interview transcript shows that he did not threaten Plaintiff during the interview and that verbal threats do not support a § 1983 claim. (Id. at 5.) He argues that Plaintiff's cases do not support his claim of a liberty interest, Plaintiff's classification has been reviewed periodically, and Saldate has no authority

or input regarding Plaintiff's housing other than his confirmation that Plaintiff continues to be a subject of an on-going investigation. (Id.)

### F. Analysis

First, it is difficult to determine the gravamen of Counts III and IV. In his First Amended Complaint, Plaintiff alleged that during his interview with Saldate, the detective twice denied him his right to an attorney. (Doc. #4 at 6-7.) Thereafter, Saldate threatened to make Plaintiff's life hell if Plaintiff did not confess to crimes and Plaintiff was then placed in maximum custody. Plaintiff designated one count as retaliation and the other a threat to safety. In his motion, Plaintiff mentions the lack of calls to his lawyer, but not a denial of the right to counsel during the interview, and he does not argue that Saldate retaliated for some action by Plaintiff. It appears that the allegations concerning denial of counsel relate to the claim that Saldate is responsible for Plaintiff's placement into maximum custody.

Plaintiff's motion for summary judgment is denied. Plaintiff offers no admissible evidence that Saldate took or failed to take any action he was required to take regarding any problems Plaintiff may have had contacting his lawyer[3] or that Saldate denied him counsel during the interview. See Rizzo, 423 U.S. at 371-72, 377. His allegation that Baca told him that Saldate wanted Plaintiff to have no contact is unsworn and, therefore, insufficient to support summary judgment. See Fed. R. Civ. P. 56 (requiring opposing or supporting affidavits.) It is undisputed that Saldate confirmed that Plaintiff is the subject of an on-going criminal investigation into an alleged murder plot, but Plaintiff's claims that Saldate *arranged* for his custody in maximum security are conclusory and unsupported by admissible evidence. And although Plaintiff denies the underlying allegations regarding the murder plot, he does not dispute that he is the subject of such an investigation. Advising prison officials of a criminal investigation does not violate an inmate's constitutional rights. Moreover,

---

[3] It appears from Baca's affidavit, that in connection with placing Plaintiff in investigative detention, Baca briefly suspended Plaintiff's telephone privileges. (Doc. #49, DSOF ¶ 16.) Baca also asserts that Plaintiff did not request any legal calls or legal visits, which Plaintiff does not dispute. (Id., Ex. D, Baca Decl. ¶ 6.)

1  Plaintiff fails to establish that he did not receive due process regarding the basis for the
2  placement into maximum security custody.  (See Sect. V.)

3  And even assuming that Saldate threatened Plaintiff or his family, verbal threats are
4  not sufficient ground for §1983 liability.  "'Verbal harassment or abuse . . . is not sufficient
5  to state a constitutional deprivation under 42 U.S.C. § 1983.'" Oltarzewski v. Ruggiero, 830
6  F.2d 136, 139 (9th Cir. 1987) (quoting Collins v. Cundy, 603 F.2d 825 (10th Cir. 1979)).
7  And Plaintiff offers no evidence that Saldate, in fact, told inmates that Plaintiff is a snitch.

8  Saldate's motion is granted.  He offers evidence that he was not involved in any denial
9  of telephone calls or other contact between Plaintiff and his counsel.  To the extent that
10 Plaintiff is now claiming that his inability to contact his criminal attorney affected the
11 outcome of his criminal case, that claim is beyond the scope of the First Amended
12 Complaint.  Saldate also offers undisputed evidence that his only involvement in Plaintiff's
13 custody status is to confirm that Plaintiff is the subject of an on-going criminal investigation
14 into an alleged murder plot; Saldate's limited involvement is confirmed by the testimony of
15 Classification Manager Harkins.  And the Court agrees that verbal harassment or threats are
16 not sufficient for § 1983 liability.

17 **V.    Count VI—Baca**

18 The remaining claim in this count is for denial of due process in connection with
19 Plaintiff's maximum-security status.

20 **A.    Legal Standards**

21 In analyzing a due process claim, the Court must first decide whether Plaintiff was
22 entitled to any process, and if so, whether he was denied any constitutionally-required
23 procedural safeguard. Liberty interests which entitle an inmate to due process are "generally
24 limited to freedom from restraint which, while not exceeding the sentence in such an
25 unexpected manner as to give rise to protection by the Due Process Clause of its own force,
26 nonetheless imposes atypical and significant hardship on the inmate in relation to the
27 ordinary incidents of prison life." Sandin, 515 U.S. at 484 (internal citations omitted).

28 To determine whether an inmate is entitled to the procedural protections afforded by

1 the Due Process Clause, the Court must look to the particular restrictions imposed and ask
2 whether they "'present the type of atypical, significant deprivation in which a state might
3 conceivably create a liberty interest.'" Mujahid v. Meyer, 59 F.3d 931, 932 (9th Cir. 1995)
4 (quoting Sandin, 515 U.S. at 486).

5       To determine whether the sanctions are atypical and significant hardships, courts look
6 to prisoner's conditions of confinement, the duration of the sanction, and whether the
7 sanction will affect the duration of the prisoner's sentence. See Keenan v. Hall, 83 F.3d
8 1083, 1088-89 (9th Cir. 1996). "Atypicality" requires not merely an empirical comparison
9 but turns on the importance of the right taken away from the prisoner. See Carlo v. City of
10 Chino, 105 F.3d 493, 499 (9th Cir. 1997). See, e.g., Sandin, 515 U.S. at 472 (30 days
11 disciplinary segregation is not atypical and significant); Torres v. Fauver, 292 F.3d 141, 151
12 (3rd Cir. 2002) (four months in administrative segregation is not atypical and significant);
13 Griffin v. Vaughn, 112 F.3d 703, 706-708 (3rd Cir.1997) (fifteen months administrative
14 segregation is not atypical and significant); Beverati v. Smith, 120 F.3d 500, 504 (4th Cir.
15 1997) (six months of confinement in especially disgusting conditions that were "more
16 burdensome than those imposed on the general prison population were not "atypical . . . in
17 relation to the ordinary incidents of prison life."); Jones v. Baker, 155 F.3d 810 (6th Cir.
18 1998) (two and one-half years of administrative segregation is not atypical and significant).

19       In Wilkinson, 545 U.S. 209, the Supreme Court held that inmates had a liberty interest
20 protected by the Due Process Clause in avoiding assignment to the state's supermax prison.
21 Supermax facilities are designed to segregate the most dangerous prisoners from the general
22 population, and the conditions are highly restrictive. Id. at 213. Conditions at the Ohio
23 facility under consideration in Wilkinson are more restrictive than death row or the
24 administrative control units. Id. at 214. Inmates remain in their 7 x 14 foot cells 23 hours-
25 per-day; a light remains on at all times, although it is dimmed; and during the one hour-per-
26 day that the inmate may leave his cell, access is limited to one of two recreation areas. Id.
27 Conversation is not permitted from cell to cell; the placement is indefinite, and after the
28 initial review, it is reviewed only annually; and placement disqualifies an otherwise eligible

inmate from parole consideration. Id. at 223-24.

Prison procedures at the Ohio facility provided that the inmate receive notice of the factual basis leading to consideration for supermax placement at least 48 hours before the hearing and an opportunity for rebuttal at a hearing at which he could offer pertinent information and an explanation or objections to the placement. Id. at 216, 225. Inmates were not permitted to call witnesses. Id. at 228. If the Classification Committee holding the hearing did not recommend placement, the process would terminate. Id. at 216. If it did recommend placement, it would document the decision, setting out the nature of the threat and the reasons for the recommendation and forward the materials to the warden. Id. at 217. If the warden disagreed, the process terminated. If the warden agreed, he indicated his approval and reasons and forwarded the materials to the Bureau of Classification for a final decision. The inmate was entitled to receive another review within 30 days; after that, placement would be reviewed at least annually. Id. The Supreme Court found the due process protections adequate. Id. at 255.

**B.     Plaintiff's Motion**

In support of his motion, Plaintiff submits various ADC documents regarding his telephone privileges and placement in maximum-security custody (Doc. #31, Exs. 4-8, 12-14). Plaintiff asserts that he was taken from level-2 custody without any disciplinary charges and placed in maximum custody and that Baca allowed Plaintiff's rights to be seized based on unsupported allegations of an outside agency.

**C.     Baca's Response and Cross Motion**

In opposition to Plaintiff's motion and in support of his own motion, Baca submits a Statement of Facts (Doc. #49, DSOF); his declaration (id., Baca Decl.); the declaration of Kristine Harkins and classification hearing exhibits (id., Ex. F. Harkins' Decl., Ex. F); and other documents.

On May 31, 2006, Plaintiff was transferred to Arizona State Prison Complex-Douglas, and on July 27, 2006, Baca placed him in investigative detention because PPD Detective Maya had informed an ADC lieutenant that Plaintiff was under investigation related to a

- 14 -

conspiracy to kill Alley. (DSOF ¶¶ 14-15.) Based on the nature of the investigation, Baca initially ordered that all of Plaintiff's telephone calls be monitored, but because there was no one at ADC to translate the Arabic portions of Plaintiff's conversations, Baca ordered Plaintiff's telephone privileges suspended until ADC could find an Arabic translator to ensure that Plaintiff was not furthering the alleged conspiracy or committing a new crime while making calls. (Id. ¶ 16.) Plaintiff did not request any legal calls or legal visits. (Id.) Baca allowed Plaintiff to call his parents in September 2006, (id. ¶ 20) and restored his phone privileges on November 21, 2006, after he had found a translator. (Id. ¶ 25). Baca never put any restriction on Plaintiff's mail, nor is he aware of any mail restriction. (Id. ¶ 29.)

On August 25, 2006, CO III Lowe drafted and submitted an information report of an interview with Plaintiff, PPD's Detectives Maya and Saldate, and DPS Sgt. Contreras. (Id. ¶ 17.) Lowe stated that over the course of the interview, he learned that Plaintiff was a suspected conspirator in a plot to assassinate a DPS officer, that he knew the officer's home address and had made at least one trip to survey the officer's home, and that co-conspirators were already in custody and would soon be indicted. (Id.) Lowe concluded that Plaintiff's classification level should be raised and he should be housed in a more secure facility. (Id.)

Inmates who are the highest risk to the public or staff are assigned to maximum custody. (Id., Ex. F, Harkins Decl. ¶ 5.) A Deputy Warden may recommend a discretionary classification override, which requires review and final decision by Central Office Classification. (Id. ¶ 10.) The person initiating the request for an override must document the reason and serve the inmate with the "Notice of Hearing and Inmate Rights" and "Request for Witness" forms at least 48 hours before the hearing. (Id. ¶ 13.) After the hearing, the C.O. III initiates the placement process and the forms and packets are sent to the Deputy Warden or designee, who approves or denies the override. (Id. ¶ 14.) If the Deputy Warden approves the placement, the packet is forwarded to the Warden. (Id.) If the Warden approves, the packet is forwarded to Central Office Classification Administrator, who has final authority. (Id. ¶¶ 15-16.) If the recommendation is denied at any stage, the process is completed. (Id. ¶¶ 14-15.) In addition, the inmate may appeal and the process provides for

1    period review—after 60 days, 180 days, and then annually. (Id. ¶¶ 17-18.)

2          Based on Lowe's report and the serious allegation against Plaintiff, Baca
3    recommended maximum-custody classification placement, pursuant to Department Order
4    801, as soon as possible to ensure the safety of the public. (DSOF ¶ 17.) On August 25,
5    2006, Plaintiff was served with a Notice of Hearing and Inmate Rights which began the
6    process of a discretionary classification override to place him in maximum custody. (Id.
7    ¶ 18.) The Notice stated the reasons for the proposed placement and a summary of the
8    evidence relied upon. (Id.)

9          On September 5, 2006, Plaintiff and C.O. III Lowe were present at the Classification
10   Maximum Custody Placement Hearing. (Id. ¶ 19.) Plaintiff did not submit a written
11   statement or request witnesses. (Harkins Decl. ¶ 23, Attach. 6, Max. Cust. Placement
12   Recom. Approval, dated Sept. 25, 2006). C.O. III Lowe recommended that Plaintiff be
13   placed in maximum custody, as did Deputy Warden Taylor, and Taylor signed for Warden
14   Sonberg. (DSOF ¶ 19.) On September 26, 2006, Morris placed Plaintiff in maximum
15   custody. (Id.) Stacy Crabtree, Offender Service Administrator, also approved the maximum
16   custody placement. (Id.) Plaintiff's appeal was denied. (Id. ¶ 24.) Plaintiff's status has been
17   reviewed. (Harkins Decl. ¶¶ 26-31.)

18         Baca asserts that Plaintiff received due process for his maximum custody placement.
19   (DSOF ¶ 28.) In addition, he argues that other than the initial direction to CO III Lowe to
20   begin the maximum custody placement process, Baca has had nothing to do with Plaintiff's
21   maximum custody classification placement. (Id. ¶ 27.)

22       **D.**    **Analysis**

23         The Court will deny Plaintiff's motion for summary judgment as to Baca. Plaintiff
24   alleges that Baca violated his rights when he placed Plaintiff into "Guantanamo Bay type"
25   isolation without disciplinary charges or a hearing. Although Plaintiff asserts that he lost
26   telephone and mail privileges, Plaintiff's evidence does not establish that he was entitled to
27   due process protections for the initial placement into investigative detention in July 2006 by
28   Baca. Measured by the severity of conditions, their duration, and the fact that there was no

1  effect on Plaintiff's sentence, the restrictions imposed do not constitute atypical and
2  significant hardships relative to the ordinary conditions of prison life. See Keenan, 83 F.3d
3  at 1088-89. Therefore, Plaintiff was not entitled to due process for placement into
4  investigative detention.

5  Defendant concedes that Plaintiff's ultimate placement in maximum security custody
6  implicates a liberty interest requiring due process protections, citing Wilkinson.[4] (Doc. #48
7  at 11.) The evidence shows that Baca recommended maximum custody placement on
8  August 25, 2006; Plaintiff was served with Notice of Hearing and Inmate Rights to begin the
9  process of classification override. But it is also undisputed that Baca had no further
10 involvement in the classification procedure. The determination of maximum custody
11 classification was made in September 2006, by Deputy Warden Taylor, who also signed for
12 Warden Sonberg, and Crabtree, Offender Service Administrator, who also approved the
13 placement. Plaintiff does not claim that the Notice of Hearing and Inmate rights was
14 defective or that he was not provided with witness forms. The gravamen of his claim is that
15 he was assigned a maximum security classification on the basis of unsupported allegations
16 by PPD. Baca was not involved in the hearing or the review of the evidence or the ultimate
17 determination to place Plaintiff in maximum custody. See Rizzo, 423 U.S. at 377.

18 Moreover, Plaintiff has not demonstrated that he did not receive due process
19 safeguards. It appears that the procedures provided by ADC are almost identical to those
20 approved by the Supreme Court in Wilkinson, with the added protection of the ability to call
21 witnesses. The basis for placement in maximum security was that "[t]he nature of the
22 criminal offenses committed prior to incarceration constitutes a threat . . . to the safety of
23 others. . . ." (Harkins Decl., Attach. 6.) The language does not limit ADC to consideration
24 of only crimes of conviction or pending charges. The September 2006 hearing record
25 contains evidence that Plaintiff was under investigation by the PPD for conspiracy to kill a

---

[4]This Court notes that there is little evidence in the record regarding the actual conditions of confinement in maximum security custody, and Plaintiff asserts that he is now in Administrative Segregation for Protection.

law enforcement officer and ADC found that the investigation showed the financial means and mindset to carry out the offense. (Id.) "In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of [others] . . . even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on "purely subjective evaluations and on predictions of future behavior." Hewitt, 459 U.S. at 474 (internal citations omitted), overruled on other grounds by Sandin, 515 U.S. at 482-83.

Likewise, the Court will grant Baca's motion for summary judgment. Because the conditions of confinement in investigative detention were not atypical or significant hardships, Plaintiff was not entitled to due process. See Keenan, 83 F.3d at 1088-89. As to the ultimate placement in maximum security custody, in addition to asserting that Plaintiff received all the due process to which he was entitled, Baca's undisputed evidence is that after initiating the reclassification process and arranging for service of the Notice of Hearing and Inmate Rights, which Plaintiff does not challenge, Baca had no involvement in review of the evidence or the decision to place Plaintiff into maximum custody. See Rizzo, 423 U.S. at 377.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion for Summary Judgment (Doc. #31); Defendant Saldate's Motion for Summary Judgment (Doc. #46), Defendants Alley's and Baca's Motion for Summary Judgment (Doc. #48), and Plaintiff's Motion for a Restraining Order (Doc. #82).

(2) Plaintiff's Motion for Summary Judgment (Doc. #31) is **denied**. Defendant Saldate's Motion for Summary Judgment (Doc. #46) and Defendants Alley's and Baca's Motion for Summary Judgment (Doc. #48) are **granted**.

(3) All pending motions are **denied** as moot.

///

///

(4) The action is terminated, and the Clerk of Court must enter judgment accordingly.

DATED this 10th day of December, 2008.

_____
Susan R. Bolton
United States District Judge